

RCH/CMM:SKW/AT/ES
F. #2024R00298

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 24, 2026

By E-Mail and ECF

The Honorable Marcia Henry
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>           Re:     United States v. Carone, et al.
>                   Criminal Docket No. 26-177 (KAM)

Dear Judge Henry:

        The defendants Anthony J. Carone ("A. Carone"), Frank V. Carone ("F. Carone"), Crystal Chen, and Yan Po Zhu, also known as "Andy Zhu," are scheduled to be presented before Your Honor later today on a thirteen-count indictment, which charges the defendants with engaging in a bribery scheme to exploit New York City's migrant crisis for their own personal gain. While the government is not currently seeking detention, to ensure the defendants do not flee or continue to obstruct justice and destroy evidence, the government respectfully submits that the Court should impose stringent bail conditions that include significant secured bonds, electronic monitoring, and an order not to communicate with witnesses or other defendants in this case.

I.    Offense Conduct[1]

    a.   The Bribery Scheme

        In 2022, F. Carone served as Chief of Staff for the Mayor of New York City. At that time, New York City was experiencing an unprecedented influx of asylum seekers. The volume vastly outpaced New York City's existing shelter system, so New York City began contracting with local hotels to house migrants via its Department of Social Services ("DSS").

---

[1]    The relevant facts, as they pertain to the defendants' pretrial detention, are proffered herein. See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings).

During his tenure as Chief of Staff, F. Carone leveraged the unprecedented migrant crisis to his own advantage by securing Zhu—a wealthy businessman and foreign national—a multimillion dollar city contract to operate his hotel as an emergency migrant shelter in exchange for $120,000 in bribes. The bribe payments were made in coordination with and facilitated by Chen—Zhu's business manager—who knew the payments were bribes. To conceal the criminal nature of the bribe payments, the bribes were funneled through a law firm owned by F. Carone's brother, A. Carone, who then directed that the funds be disbursed to pay F. Carone's personal American Express bills and later wrote checks to F. Carone.

Initially, Zhu and Chen tried to use other channels to secure a migrant shelter contract for Zhu's hotel, the Microtel. Senior DSS officials, however, repeatedly rejected the Microtel as a suitable shelter site for several reasons, including its small size and its location in Long Island City, which was already saturated with existing shelters. The high number of existing shelters in Long Island City led to significant resistance from local residents and community leaders that made it difficult for DSS to justify converting additional hotels in Long Island City to emergency migrant shelters.

After Zhu and Chen failed to secure a shelter contract through other channels, they bribed F. Carone to secure a shelter contract for the Microtel. F. Carone used his official position as Chief of Staff to intercede on the Microtel's behalf in exchange for $120,000 of bribe payments from Zhu and Chen. Despite DSS's prior independent assessment that the Microtel was not a suitable location for a temporary shelter, the Microtel was ultimately awarded an Emergency Shelter Contract due to Frank Carone's directive to DSS to consider the Microtel for such a contract. The Microtel ultimately received $6,825,000 pursuant to shelter contracts, which inured to the benefit of Zhu and Chen.

In order to conceal the criminal scheme and hide the bribe payments, Zhu entered into a sham retainer agreement with A. Carone and then funneled the bribe payments through A. Carone's law firm bank account to F. Carone. A. Carone commingled the bribe payments with other funds, including funds he began receiving from F. Carone's former clients when F. Carone joined New York City government. A. Carone then directed that the majority of those funds be disbursed to F. Carone. In 2022 alone, A. Carone funneled approximately $500,000 to F. Carone through his law firm bank account. Tellingly, A. Carone's law partners were not aware that the law firm bank account, which had been dormant for years prior to 2022, was being used, or that their law firm was directing funds to F. Carone while he was Chief of Staff and afterwards.

In November 2023, Chen emailed A. Carone requesting to terminate the sham retainer agreement. By that time, Zhu and Chen had made the equivalent of 12 payments totaling $120,000, as called for in the sham retainer agreement. Nonetheless—and despite no services having been provided for October 2023 or November 2023—A. Carone responded, "Please immediately remit the fees for October and November and then we will consider this matter terminated." The next day, no further payments having been made, F. Carone texted Zhu and stated, "I need to see you." F. Carone and Zhu then exchanged a series of text messages regarding the bribe payments. Consistent with A. Carone's stated belief that additional payments were owed, F. Carone informed Zhu that he was "not happy about something." In response,

2

referring to the bribe payments made under the sham retainer agreement, Zhu responded that he had "asked my partners to pay you for a year."

Notably, F. Carone did not report the bribe payments to the IRS on his 2022 tax return, nor did he report the funds he received from the law firm bank account to the New York City Conflicts of Interest Board or the IRS. In addition, neither A. Carone nor A. Carone's law firm reported all of the income in the law firm bank account to IRS in their initial 2022 tax filings. In 2025, however, only after learning about the federal investigation, A. Carone amended his 2022 personal and law firm tax returns to declare as income approximately $300,000 he received in the law firm bank account that he previously did not report.

b. The Defendants' Obstruction of Justice

Throughout this investigation, each defendant has engaged in serious instances of obstruction of justice, ranging from physically resisting Court-authorized search warrants to destroying and fabricating evidence. Together, this conduct shows a clear pattern of the defendants' lack of respect for the law and willingness to go to extremes to avoid the consequence of their actions.

After learning of the government's investigation, F. Carone and A. Carone attempted to conceal that they laundered bribe payments through A. Carone's law firm bank account to F. Carone by fabricating evidence. In 2024, F. Carone and A. Carone created a promissory note that they backdated to 2022—when Zhu and Chen bribed F. Carone and the bribe payments were funneled through A. Carone's law firm bank account—so that it would appear that the transfers of funds from A. Carone's law firm to F. Carone were a loan. Ultimately, the fabricated promissory note was provided to federal authorities.

F. Carone also engaged in efforts to obstruct the investigation by attempting to prevent law enforcement from obtaining critical evidence. F. Carone deleted multiple incriminating text messages with Zhu about the bribery scheme, including the text from Zhu where Zhu stated that, "I asked my partners to **pay you** for a year." (emphasis added). F. Carone's decision to delete these messages demonstrates his clear consciousness of guilt and intent to obstruct the investigation.

In addition, as evidenced by text messages and call logs, after Zhu sent an incriminating message to F. Carone asking for help securing a shelter contract, F. Carone called A. Carone, and then A. Carone instructed Zhu to stop texting F. Carone about the shelter contract. F. Carone and A. Carone's desire to stop Zhu from creating a paper trail documenting their criminal scheme further establishes their pattern of obstruction and consciousness of guilt.

Zhu and Chen also took steps to obstruct the investigation. For example, on March 14, 2025, agents from the Federal Bureau of Investigation ("FBI") executed a judicially authorized search warrant signed by a judge in the Eastern District of New York to search Zhu's home and seize his electronic devices. During the execution of that warrant, law enforcement agents located Zhu's phone and informed Zhu that the warrant allowed them to hold Zhu's phone in front of Zhu's face to unlock it. In response, among other things, Zhu held his hand in front of

his face for the remainder of the search warrant execution to prevent agents from unlocking his phone.  On several occasions, when agents attempted to hold the phone toward Zhu's face to unlock it, Zhu covered his face with one hand and swung his other hand wildly in the air in front of his face.  Zhu's obstruction ultimately prevented the FBI from unlocking Zhu's phone.

On the same day, Chen similarly attempted to obstruct the execution of a judicially authorized search warrant at her home.  After FBI agents presented Chen with a valid search warrant to search her cell phone, Chen consented to a search of her phone and agreed to unlock it.  But instead of unlocking it, Chen took a long pause and stated that she could not remember her password.  Chen then began entering multiple incorrect passwords into the phone, placed the phone on a table, and stated that she was locked out of the phone.  After agents told Chen that, among other things, they believed that she was lying about not remembering her password, Chen unlocked her phone.

## II.    Criminal Histories

The government is not aware of the defendants F. Carone, Zhu, or Chen having criminal histories.  On January 12, 2023, A. Carone was arrested for driving while intoxicated and refusing to take a breath test.  He was charged with a misdemeanor violation.  A. Carone subsequently pleaded guilty to driving while impaired, an infraction under New York State law.

## III.   Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight and that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.  See 18 U.S.C. § 3142(e).  A finding of dangerousness must be supported by clear and convincing evidence.  See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight or obstruction of justice must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009).

Short of detention, the Court must impose such additional conditions as will reasonably assure the defendant's appearance as required and the safety of any other person and the community.  See 18 U.S.C. § 3142(c)(1)(B). This may include executing "an agreement to forfeit upon failing to appear as required, property of a sufficient unencumbered value." Id. § 3142(c)(1)(B)(xi). The Bail Reform Act lists the following factors to be considered in the detention analysis: (i) the nature and circumstances of the offenses charged; (ii) the weight of the evidence against the defendant; (iii) the defendant's history and characteristics; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  See 18 U.S.C. § 3142(g).[2]

---

[2]     Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also LaFontaine, 210 F.3d at 130–31.  In the pre-trial context, few detention hearings involve

IV.    The Court Should Order Stringent Bail Conditions

Stringent bail conditions and substantial, secured bonds are warranted to ensure that the defendants do not flee or continue to destroy evidence and obstruct justice. Specifically, a bond secured by property and cash as well as electronic monitoring is appropriate.[3]

First, the weight of the evidence in this case is strong, favoring stringent bail conditions and significant bonds. Where, as here, the evidence of guilt is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased"). Among other things, the evidence here includes emails, text messages, call logs, witness statements and financial records that map out the defendants' conspiracy. In fact, some of the scheme is set out in text messages that F. Carone deemed so damning that he deleted them.

Second, the history and characteristics of the defendants weigh in favor of stringent bail conditions and significant bonds. Both F. Carone and A. Carone are attorneys yet committed these crimes and obstructed justice. F. Carone abused his position of trust and power as Chief of Staff to enrich himself and his co-conspirators. A. Carone, too, abused the trust of his law partners to funnel bribe payments through his law firm bank account to F. Carone. In addition, Zhu and Chen have engaged in a pattern of attempting to bribe other government officials including by giving them expensive gifts.[4] Thus, the characteristics of the defendants warrant stringent bail conditions.

Third, each of the defendants' obstructive conduct described above also warrants stringent bail conditions and significant bonds. See LaFontaine, 210 F.2d at 134–35 (upholding the revocation of bail for a white-collar defendant who attempted to influence a witness because "obstruction of justice has been a traditional ground for pretrial detention by the courts"). Indeed, Zhu and Chen have already demonstrated their lack of respect for court orders by obstructing the execution of judicially authorized search warrants. See, e.g., id. (upholding revocation of bail because a defendant's "past circumvention of court orders demonstrates that

_____

live testimony or cross-examination. Most proceed on proffer. Id. at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery." Id. (internal quotation marks omitted); see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001), ("We find the district court committed clear error in failing to credit the government's proffer with respect to [the defendant's] dangerousness.").

[3]    The government respectfully recommends that the standard additional conditions are also necessary, including, among other things, pretrial supervision and reporting, random home and/or employment visits, restricted travel, surrendering of passports, and to refrain from contact with co-defendants, co-conspirators, and witnesses.

[4]    See Fed. R. Evid. 404(b) ("Evidence of any other crime . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.")

pretrial monitoring is not sufficient.").  F. Carone and A. Carone's fabrication of evidence also necessitates strict bail conditions that will ensure their compliance with the rule of law. <u>See, e.g.,</u> <u>United States v. Amanat</u>, 454 F. Supp. 3d 358, 363–64 (S.D.N.Y. 2020) (citing allegations the defendants obstructed justice by fabricating evidence as a ground for detention).

<u>Fourth</u>, the defendants pose a risk of flight, which warrants stringent bail conditions and significant bonds.  Zhu and Chen are Chinese nationals with extensive foreign ties to a country that does not extradite to the United States, thus increasing their risk of flight. <u>See</u> <u>United States v. Banki</u>, 369 F. App'x 152, 153 (2d Cir. 2010) (affirming pretrial detention of a defendant because ties to a foreign nation suggest "release would pose a serious risk of flight"). F. Carone frequently travels overseas, including on private planes, which makes it more difficult for the government to monitor his travel.  <u>See, e.g,</u> <u>United States v. Lacerda</u>, No. 12-CR-303, 2013 WL 4483576, at *10 (D.N.J. Aug. 19, 2013) (citing "financial means and experience in international travel by private plane" as a basis for revocation of pretrial release and bail).  F. Carone and Zhu also have access to significant financial resources that make fleeing justice possible.  <u>See, e.g.</u>, <u>United States v. Weigand</u>, 492 F. Supp. 3d 317, 318 (S.D.N.Y. 2020) (requiring a $3 million bond secured by $470,000 in cash and home confinement to mitigate the risk of flight due to "substantial wealth").  Indeed, the government's investigation has revealed that F. Carone and Zhu both have substantial wealth.  Public reporting reveals the same.[5]

<u>Fifth</u>, the significant terms of imprisonment that the defendants face create a substantial incentive to flee and necessitate the bond conditions set forth above.  Here, the government estimates that the defendants each face a significant sentence should they be found guilty.  The possibility of a severe sentence is an important factor in assessing a defendant's likelihood of flight. <u>See</u> <u>Jackson</u>, 823 F.2d at 7; <u>United States v. Martir</u>, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendant charged with serious offenses whose maximum combined terms created "potent incentives to flee"); <u>United States v. Cisneros</u>, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); <u>United States v. Townsend</u>, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); <u>United States v. Dodge</u>, 846 F. Supp. 181, 184–85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight); <u>United States v. Sabhnani</u>, 59 F. Supp. 2d 377, 381 (E.D.N.Y. 2007) (citing a lengthy potential sentence as a basis to find risk of flight).

In sum, the government has established by a preponderance of the evidence that each of the defendants is a risk of flight for purposes of the Bail Reform Act, and thus the substantial bonds outlined above are warranted.

---

[5]        <u>See</u> https://brooklyneagle.com/327674/frank-carone-sells-brooklyn-home-to-anora-mansion-owner-moves-to-manhattan/ ("FRANK CARONE . . . recently sold his Mill Basin home for $4.5 million[.]" (last visited June 24, 2026).

V.    Conclusion

The defendants engaged in a sweeping bribery scheme for their own corrupt ends. For the reasons outlined above, the government respectfully submits that the Court should order stringent bail conditions to ensure the defendants' appearance in court and prevent further obstructive conduct.

Respectfully submitted,

MICHAEL G. CONSIDINE
Attorney for the United States
Acting under Authority Conferred by 28
U.S.C. § 515

By:    _____/s/_____
Sara K. Winik
Adam R. Toporovsky
Eric Silverberg
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (by ECF)
Defense Counsel (by ECF)