**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FTB/CMM:SKW/AT/EWS/MOM
F. #2024R00298

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 2, 2026

By ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Carone, et al.
Docket Number 26-CR-177 (KAM)

Dear Judge Matsumoto:

The government respectfully moves for an order authorizing the disclosure of the entire file associated with defendant Anthony Carone's ("A. Carone") purported representation of defendants Yan Pho Zhu ("Zhu") and Zhu's employee Crystal Chen ("Chen"), including disclosure by the United States Attorney's Office's (the "Office") filter team to the trial team of communications and documents exchanged among A. Carone, Zhu and Chen on the grounds that: (1) they do not seek legal advice; or (2) are discoverable under the crime-fraud exception. As discussed more fully below, the defendants cannot shield their exchanges merely by asserting that A. Carone served as counsel to Zhu, Chen or their related entities. As alleged in the Indictment, the purported retainer agreement between A. Carone and Zhu was a sham used to funnel and conceal bribes paid by Zhu and Chen to Frank Carone ("F. Carone"). Communications that did not seek or convey legal advice were never privileged, and those made to advance or conceal the charged scheme fall within the crime-fraud exception. Accordingly, the Court should authorize disclosure of the communications and documents between A. Carone, Zhu and Chen to the trial team.[1]

---

[1] As set forth below, certain of these communications are in the possession, custody and control of the government's filter team, which is prepared to release them upon entry of a court order.

# I. Background

## A. The Indictment and the Bribery Scheme

On June 12, 2026, a grand jury sitting in the Eastern District of New York returned a thirteen-count indictment (the "Indictment" or "Ind.") charging all defendants with: (1) conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371; (2) using interstate facilities to commit bribery, in violation of 18 U.S.C. § 1952(a)(3)(A); (3) conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349; (4) honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346; and (5) money laundering conspiracy in violation of 18 U.S.C. § 1956(h). In addition, F. Carone, Chen and Zhu are each charged with federal program bribery, in violation of 18 U.S.C. § 666. And F. Carone and A. Carone are charged with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), and subscribing to false tax returns, in violation of 18 U.S.C. § 7206(1).

As alleged in the Indictment, the charges arise from the defendants' scheme to exploit New York City's urgent need for shelter space in 2022, when the number of arriving migrant asylum seekers exceeded the capacity of the City's then-existing shelter system. To meet that need, the City began contracting with local hotels to house migrant asylum seekers.

After Zhu and Chen failed to secure a shelter contract through other channels, they bribed F. Carone to secure a shelter contract for the Microtel. F. Carone used his official position as Chief of Staff to the mayor of New York City to intercede on the Microtel's behalf in exchange for $120,000 of bribe payments from Zhu and Chen. Despite the New York City's Department of Social Service's ("DSS") prior independent assessment that the Microtel was not a suitable location for a temporary shelter, the Microtel was ultimately awarded an Emergency Shelter Contract due to Frank Carone's directive to DSS to reconsider the Microtel for such a contract. See Ind. ¶¶ 17-46.

## B. The Sham Retainer Agreement

To conceal the criminal scheme and hide the bribe payments, A. Carone and Zhu executed a sham legal retainer agreement. On October 14, 2022, Zhu signed a document on behalf of a holding company he controlled, purporting to retain A. Carone's law firm "in connection with various legal matters related to the leasing and/or development of the premises known as 29-12 4th Avenue, Long Island City, NYC" (i.e., the Microtel) (the "Sham Retainer Agreement").[2] See Exhibit 1 at EDNY_0000062064—EDNY_0000062067[3]; see also Ind. ¶ 35. The Sham Retainer Agreement provided for a "minimum" of a 12-month term, during which Zhu's entity was required

[2] The Sham Retainer Agreement was executed between A. Carone and one of Zhu's entities and was signed by Zhu and A. Carone.

[3] The exhibits to this letter motion have been filed under seal; the documents were exchanged in discovery, contain information concerning third parties, and reveal information produced to the government in the course of its investigation. See United States v. Amodeo, 71 F.3d 1044, 1050-51 (1995). Exhibit 1 is an excerpt of the document produced to the defendants by the government bearing Bates numbers EDNY_0000062047—EDNY_0000062067.

to make "flat fee" payments of $10,000 to A. Carone's law firm, for a total of $120,000, with an option to renew. Ind. ¶ 35. The bribe payments were comingled with legal fees from other clients that F. Carone referred to A. Carone while F. Carone served as Chief of Staff. Id. ¶ 38. A. Carone deposited those client fees into a once-dormant law firm account and then steered the majority of the fees to F. Carone.

The defendants did not intend the Sham Retainer Agreement to establish a bona fide attorney-client relationship between A. Carone and Zhu. Rather, they intended it to be an artifice to funnel and conceal bribe payments from Zhu and Chen to F. Carone in exchange for F. Carone's interceding on the Microtel's behalf and securing an emergency shelter contract for the Microtel from New York City. As alleged in the Indictment:

- On or about September 24, 2022, Zhu and F. Carone socialized at Zhu's house. See Ind. ¶ 25.
- Two days later, on or about September 26, 2022, Zhu texted F. Carone, "My brother 29-12 40 Ave please help me get done we need to refinance." Id. ¶ 26.
- On or about September 27, 2022, A. Carone texted Zhu, "I want to talk to you about LIC." Id. ¶¶ 26-27.
- The next day, A. Carone and Zhu met at a social club in Manhattan. Id. ¶ 27.
- At or around the same time, Chen texted A. Carone confirming Zhu's understanding that the Microtel was "submitted yesterday"—that is, the same day Zhu texted F. Carone seeking his assistance to obtain the emergency shelter contract for the Microtel. Id. ¶ 27.
- The same day, F. Carone met with City Official #1 at the same club. Id.
- On October 4, 2022, City Official #1 texted A. Carone to reiterate that, given the concentration of hotels already awarded emergency shelter contracts in Long Island City, Queens, and continued community opposition, DSS had been focusing on locating hotels in "places other than LIC" to operate as emergency shelter contracts. Id. ¶ 29.
- On October 11, 2022, City Official #2 sent an email to DSS staff and provided the address for the Microtel and Chen's contact information, stating that the Microtel had "come directly from the top . . . I know it is LIC, but we should assume it is approved (confirmed with [City Official #1])."
- On October 14, 2022, the Sham Retainer Agreement was executed, and Zhu and Chen began making monthly payments

to F. Carone through A. Carone's law firm bank account. Id. ¶ 27.

- On or about October 20, 2022, the Microtel was approved by the City for an emergency shelter contract. Id. ¶ 28.

Communications between Chen and Individual #1 alleged in the Indictment further show that the Sham Retainer Agreement served as a conduit for bribe payments to F. Carone. On or about October 21, 2022, one week after the Sham Retainer Agreement was executed, Chen texted Individual #1 the following:[4]

CHEN: The boss completely trusts the two brothers.

Individual #1: Isn't it just about giving $120,000?

CHEN: In the end, it's all about money and giving the two brothers a way out.

Individual #1: How much? 120k?

CHEN: Its still 12

…

And they said that if there is a renewal, it will still be charged every month

…

He still said it was approved because of their contribution, no matter whose application it was.

…

Individual #1: I got 120,000 yuan for no reason, and I will continue to blackmail you in the future.

CHEN: Then the boss said, "if [Consultant #1's] application had been approved two weeks earlier, we would not have signed the 12th one last.

Its all bullshit.

The two brothers got a bargain for nothing. Then we begged them to accept it. Why…

Ind. ¶ 36.

---

4 As stated in the Indictment, the messages described herein between Chen and Individual #1 were originally in Mandarin and have been translated into English in sum and substance.

The evidence gathered during the investigation indicates that A. Carone did not provide legal services to Zhu or the Microtel under the Sham Retainer Agreement. For example, in January and February 2023, Chen negotiated the terms of the Microtel's emergency shelter contract with the Hotel Association of New York City ("HANYC"), which was responsible for negotiating such contracts. See Exhibit 2 at EDNY_0001023116—EDNY_0001023148.[5] Although A. Carone inserted himself into the negotiations on a few occasions, he was removed from the thread. Compare id. at EDNY_0001023143—EDNY_0001023145, with id. at EDNY_0001023126—EDNY_0001023124. At one point in the email thread, HANYC officials criticized A. Carone, calling him unresponsive and "unprofessional." See, e.g., id. at EDNY_0001023143. In response, a representative of the Microtel said explicitly that HANYC "d[id] not need to speak with him," and the parties proceeded to negotiate without A. Carone. Id.

Likewise, in 2023, while the Sham Retainer Agreement remained in effect, Zhu sought a long-term shelter contract for the Microtel, which until then had operated under an emergency contract. See Exhibit 3.[6] Rather than turn to A. Carone to negotiate the long-term contract, Zhu and Chen paid $15,000 to another individual with ties to New York City government to help secure the long-term contract. By that time, F. Carone was no longer the Mayor's Chief of Staff.

Zhu and Chen's dispute with A. Carone over unpaid retainer payments in November 2023 further underscores the sham nature of the purported legal relationship. On or about November 20, 2023, Chen emailed A. Carone asking to terminate the retainer agreement. Although A. Carone had provided no services in October or November 2023, he asked Chen to "please immediately remit the fees for October and November and then we will consider this matter terminated." Ind. ¶ 44. Chen and Zhu did not pay. Id. ¶ 45. The next day, F. Carone texted Zhu, "I need to see you." Id. On December 25, 2023, F. Carone told Zhu that he was unhappy and would not discuss any future deals until the "past is worked out." Id. ¶ 46. Zhu responded that he had "asked my partners to pay you for a year."

### C. Communications Between and Among A. Carone, Zhu and Chen

During its investigation, the government obtained data from A. Carone's, Zhu's, and Chen's personal devices and an iCloud account associated with Zhu pursuant to judicially authorized search warrants. The government employed a filter team to review the materials for potentially privileged communications before any such materials were provided to the trial team.

---

[5] Exhibit 2 is an excerpt of a document produced to the defendants by the government bearing Bates numbers EDNY_0001023049—EDNY_0001023419.

[6] Exhibit 3 is a filtered version of the document produced to the defendants by the government in discovery bearing Bates number EDNY_0001023049. Exhibit 3 now shows only relevant messages exchanged between Zhu and the individual described above.

The trial team understands that the filter team has identified communications and documents that were exchanged among A. Carone, Zhu and Chen.[7]

In addition, [redacted]

[redacted][8]

On September 25, 2026, the government discussed the issues raised in this motion with Zhu's counsel. Zhu's counsel represented, in sum and substance, that they first needed to review the full set of communications from the seized electronic devices and iCloud, and that review would take some time.[9] As explained below, the government submits that the crime-fraud exception permits disclosure of the communications to the trial team even if they would otherwise be privileged. The Court can therefore decide that issue without awaiting defense counsel's review.

## II. Argument

### A. Applicable Law

#### 1. The Attorney-Client Privilege

The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice. In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007); see also United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (same). The party asserting the

---

[7] The filter team's review remains ongoing. With respect to A. Carone's personal device, the government has agreed that his counsel may conduct the initial filter review, although the terms of that process are still being negotiated.

[8] Pursuant to Federal Rule of Criminal Procedure 6(e), the government has redacted references to the grand jury process in the publicly filed version of this letter motion.

[9] Zhu's counsel further stated that Chen's attorney would also need to review the communications. However, Chen had no independent attorney-client relationship with A. Carone. Any privilege Chen might assert would arise from her role as Zhu's employee and Zhu's attorney-client relationship with A. Carone.

privilege bears the burden of establishing its essential elements. In re Grand Jury Subpoena Dated January 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (citing In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)). This burden cannot be discharged by mere conclusory or ipse dixit assertions. Id. at 225.

"It must be emphasized that it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence." In re Horowitz, 482 F.2d 72, 81-82 (2d Cir. 1973). The Second Circuit has held that "subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed, whether because disclosure is viewed as an indication that confidentiality is no longer intended or as a waiver of the privilege." Id. at 81.

To balance this protection of confidentiality with the competing value of public disclosure, courts "apply [the privilege] 'only where necessary to achieve its purpose'" and "construe the privilege narrowly because it renders relevant information undiscoverable." In re Cnty. of Erie, 473 F.3d at 418 (quoting Fisher v. United States, 425 U.S. 391, 403 (1976)). Because the privilege "stands in derogation of the public's right to every man's evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000) (internal quotation marks and citation omitted).

**2. The Crime-Fraud Exception**

The attorney-client privilege does not protect communications made in furtherance of a contemplated or ongoing crime or fraud. In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984); see also United States v. Rivera, 837 F. Supp. 565, 568 (S.D.N.Y. 1993) (communications not protected if in furtherance of criminal or fraudulent activity); In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) ("Roe I") (holding that the crime-fraud exception does not protect communications or work product used to seek advice in furtherance of a crime or fraud (citing United States v. Zolin, 491 U.S. 554, 563 (1989))).

To invoke the crime-fraud exception, the government must establish probable cause to believe that a crime or fraud was contemplated or attempted and that the communications at issue were intended to facilitate or conceal it. Roe I, 68 F.3d at 40. The scheme need not have succeeded. In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983, 731 F.2d at 1039. And the government need not definitively establish a fraudulent objective or rule out every innocent explanation. See In re Grand Jury Subpoenas Dated Sept. 13, 2023, 128 4th 127, 142 (2d Cir. 2025) (the possibility of an innocent explanation for the alleged facts does not defeat probable cause); see also United States v. Parnas, No. 19 Cr. 725 (JPO), 2022 WL 3047123, at *3 (S.D.N.Y. Aug. 1, 2022) (granting government's crime-fraud motion, despite the fact that defendant's proffered innocent explanation was "indeed possible," because the email was at least as likely intended to further the illegal scheme).

Probable cause in this context is "not an overly demanding" standard. A.I.A. Holdings, S.A. v. Lehman Brothers, Inc., No. 97 Civ. 4978 (LMM), 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999). It requires a reasonable basis to suspect that a crime or fraud was

contemplated or attempted and that the communications were intended to further it. In re Grand Jury Subpoenas dated Sept. 13, 2023, 128 F.4th at 142. Evidence that the client or lawyer subsequently took steps to advance the scheme may support that showing. In re Grand Jury Investigation, 445 F.3d 266, 279 (3d Cir. 2006) (quoting In re Public Defender Serv., 831 A.2d 890, 910 (D.C. 2003)).

The Court may decide whether the exception applies on the existing record without examining the communications *in camera*. See United States v. Jacobs, 117 F.3d 82, 87 (2d Cir. 1997), abrogated on other grounds by Loughrin v. United States, 573 U.S. 351 (2014). If such a review would assist the Court, a lesser threshold permits it: a factual basis supporting a reasonable, good-faith belief that *in camera* review may reveal evidence establishing the exception. See id. Whether to conduct that review is within the Court's discretion. See id.

The government may make the requisite showing as to a defined category of communications where the evidence establishes that the communications in that category furthered or concealed the scheme. See United States v. Constanzo, No. 22-CR-281 (JPO), 2024 WL 2046053, at *3 (S.D.N.Y. May 8, 2024). Where the evidence shows that the purported legal relationship itself served the fraudulent scheme, the Court may order disclosure of communications within that category without requiring the filter team to identify each covered communication in advance. See United States v. McDonald, No. 01–CR–1168 (JS), 2002 WL 31956106, at *5-6 (E.D.N.Y. May 9, 2002) (ordering disclosure of communications where evidence, including facts in superseding indictment and grand-jury testimony, showed that that the sham legal retainer served as a conduit for concealing illegal payments); see also United States v. Schlesinger, No. 02-CR-485 (ADS), 2005 WL 8158206, at *5 (E.D.N.Y. Apr. 8, 2005) (*in camera* inspection was "unnecessary and impracticable" because grand jury testimony and superseding indictment established probable cause to believe that the defendant's communications with his attorneys about the alleged fraudulent schemes were intended to further those schemes).

**B. Discussion**

The entire file associated with A. Carone's purported representation of Zhu and Chen, including communications and documents exchanged between A. Carone, Zhu and Chen, falls within the crime-fraud exception. The Court therefore should issue and order (i) compelling both the Microtel and A. Carone's law firm to [redacted] by providing all documents and communications related to A. Carone's purported representation, and (ii) authorizing the government's filter team to release all communications and documents exchanged between A. Carone, Zhu, and Chen that were obtained pursuant to judicially authorized warrants.

The evidence establishes probable cause to believe that the purported attorney-client relationship was created and used to facilitate and conceal bribe payments to F. Carone, and that the communications and documents implementing and maintaining that relationship furthered the charged scheme. The government submits that virtually no legal advice was sought or provided under the arrangement. To the extent any of the materials otherwise qualify for protection, however, the crime-fraud exception supplies an independent basis for their disclosure to the government's trial team.

The Indictment establishes the probable cause required for the first element of the crime-fraud exception. See Roe I, 68 F.3d at 40. By charging A. Carone, Zhu and Chen with a fraudulent scheme to pay bribes to F. Carone to secure the Microtel's emergency shelter contract, the grand jury found probable cause to believe that a crime or fraud was committed or attempted. United States v. Levin, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *4 (S.D.N.Y. Oct. 5, 2015) (finding the first prong satisfied by an indictment charging mail and wire fraud); Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975) (explaining that a facially valid indictment returned by a properly constituted grand jury establishes probable cause).

The second element is independently established by the evidence showing how the defendants created and used the purported representation to implement and conceal the payment arrangement. The government recognizes that the exception requires a purposeful connection between the communications sought and the criminal activity: communications must themselves further or conceal the scheme, rather than merely provide evidence of it. See Roe I, 68 F.3d at 40-41; see also In re Richard Roe, Inc., 168 F.3d 69, 71-72 (2d Cir 1999) ("Roe II"). That connection exists here because the purported representation supplied both the conduit for the bribe payments and the false explanation for their purpose.

As alleged, the defendants executed the Sham Retainer Agreement specifically to funnel bribes to F. Carone in exchange for securing an emergency shelter contract for the Microtel. See Ind. ¶¶ 34-46. The Sham Retainer Agreement provided for monthly payments of $10,000 to A. Carone's law firm, totaling $120,000, which were then funneled to F. Carone through payments to his personal credit cards and, later, transfers to an account he controlled. Id. ¶¶ 35, 37-39. Communications and documents used to establish the arrangement, or to direct or to facilitate those payments, or to disguise them as legal fees therefore served the scheme's execution and concealment.

The chronology further demonstrates that the defendants had embarked on a criminal course before formalizing the purported representation. See United States v. Tucker, 254 F. Supp. 3d 620, 622 (S.D.N.Y. Jun. 6, 2017) ("With strong emphasis on intent, the crime-fraud exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity. It is therefore relevant to show that the wrong-doer had set upon a criminal course before consulting counsel." (quoting Jacobs, 117 F.3d at 88) (emphasis in original)). That circumstance bears directly on whether the relationship was intended to facilitate criminal activity rather than obtain legitimate legal advice. See Jacobs, 117 F.3d at 88. On September 27, 2022, just a day after Zhu sought F. Carone's assistance in securing the Microtel's emergency shelter contract, A. Carone texted Zhu "I want to talk to you about LIC." Ind. ¶¶ 26-27. The next day, A. Carone and Zhu met at a social club in Manhattan, and Chen texted A. Carone confirming Zhu's understanding that the Microtel had been submitted the previous day—that is, the same day Zhu texted F. Carone for his assistance in obtaining the shelter contract for the Microtel. Id. ¶ 27. On October 14, 2022, Zhu instructed Chen to begin making monthly payments of $10,000 to F. Carone through A. Carone's law firm account, and the Sham Retainer Agreement was executed that same day. Id. ¶ 28. Six days later, the City approved the Microtel's emergency shelter contract. Id. ¶¶ 32-33.

Thus, there is probable cause to believe that, by the time the Sham Retainer Agreement, was executed: (i) F. Carone had already directed City Official #1 to approve the Microtel; (ii) Zhu and Chen had already agreed to make bribe payments to F. Carone through A.

Carone; and (iii) the Microtel proposal had already been submitted to DSS with the message that it had been approved "from the top." The Sham Retainer Agreement thus supplied a veneer of legitimacy for payments made pursuant to an existing bribery scheme, disguising them as legal fees. Its function continued beyond the contract award: the monthly payment structure provided a means to fulfill the corrupt payment obligation while concealing the payments' true recipient and purpose.

The use of A. Carone's law firm bank account underscores the sham nature of the arrangement. See Ind. ¶ 38. The bribe payments were paid into a law firm bank account that lay dormant for more than a half-decade. The fees were comingled with fees paid by other clients who previously belonged to F. Carone before he became Chief of Staff. Id. A. Carone did not inform his law partners that Zhu had retained A. Carone or their firm. Id. ¶ 35. Nor did he inform his partners that the firm was facilitating various cash payments from Zhu into the account on behalf of F. Carone and, in turn, funneling those payments back to F. Carone in various ways. Id.

The defendants' subsequent conduct reinforces that the purported attorney-client relationship had no independent legitimate function. As described above, in January and February 2023, A. Carone was excluded from negotiations with the City over the emergency shelter contract's terms—the very legal matters the agreement purported to cover. In 2023, while the Sham Retainer Agreement remained in effect, Zhu and Chen again bypassed A. Carone when seeking a long-term contract for the Microtel, instead retaining another individual with personal ties to City Hall. Considered together with the other evidence described above, this conduct supports the conclusion that A. Carone's role was to facilitate and conceal bribe payments rather than provide legal services. See Amusement Ind., Inc. v. Stern, 293 F.R.D. 420, 440 (S.D.N.Y. 2013) (finding that lawyers communications were used by client to execute transactions at heart of fraudulent scheme (citing In re Grand Jury Subpoena, 419 F.3d at 343 n.12)); see also Schlesinger, 2005 WL 8158206, at *5 (ordering full disclosure of communications between defendants and lawyers, finding in camera inspection was "unnecessary and impracticable").

Two cases in this District are particularly instructive. In Schlesinger, the court applied the crime-fraud exception to communications between a defendant charged with insurance and creditor fraud and two attorneys who helped structure payments and security interests to render the defendant's corporate assets judgment proof. 2005 WL 8158206 at *1-3. The court found probable cause to believe that the defendant's sole purpose in seeking counsel was to further his fraudulent scheme. Id. at *4. It declined to inspect each challenged communication *in camera* because the existing evidence established that communications concerning the fraudulent transactions were intended to facilitate the scheme. Id. at *5.

In McDonald, the court applied the crime-fraud exception to communications concerning counsel's creation of LLCs and other legal entities to facilitate the embezzlement of money from Nassau County. 2002 WL 31956106, at *1. Upon finding that the legal arrangement served as a conduit for and concealed the payments, the court compelled counsel to testify about communications concerning that representation. See id. at *3-5. It therefore ordered counsel to testify before the grand jury about communications with his clients concerning the representation. Id. at *5. Both cases support examining the demonstrated function of the particular representation and the transactions it implemented. Here, that function was to channel bribe payments to F. Carone and conceal them behind a purported obligation to pay legal fees.

The government's request encompasses the file of this particular purported representation, together with related communications and documents held by the filter team that implemented or maintained the same arrangement. The government does not rely merely on the participants' identities or the materials' relevance to the charged offenses. Rather, the retainer's false explanation for the payments, the use of A. Carone's law firm account as a means of funneling payments to F. Carone, and what appears to be the absence of legitimate legal services establishes the purposeful connection between the purported representation and the scheme. Taken together, these circumstances support disclosure of the entire associated file.

The Court may resolve the motion on the existing record without reviewing the materials *in camera*. Such review is discretionary, and the government submits that the evidence already establishes the arrangement's purpose and its connection to the requested materials. See Zolin, 491 U.S. at 572. Alternatively, if the Court determines that review is necessary to resolve the scope of disclosure, the government respectfully requests that the Court conduct an *in camera* review and permit the filter team to submit supplemental briefing addressing the materials at issue.

Accordingly, the government respectfully requests an order authorizing disclosure to its trial team of the entire file associated with A. Carone's representation of Zhu and Chen, including related communications and documents in the filter team's possession, custody and control that implemented, maintained, or concealed the bribery arrangement.[10]

---

[10] There may be other grounds to compel the disclosure of the entire file of A. Carone's representation of Zhu and Chen to the government. For instance, if any of the defendants intend to rely on any communications or documents relating to the representation at trial, or at any other point in these proceedings, they must be compelled to produce the entire file as a matter of fundamental fairness. See In re County of Erie, 546 F.3d 222, 229 (2d Cir. 2008) (holding that a party may not disclose favorable privileged material while withholding related material that could rebut it); John Doe Co. v. United States, 350 F.3d 299, 306 (2d Cir. 2003) (same); In re Grand Jury Proceedings, 219 F.3d 175, 182-83 (2d Cir. 2000) (same); United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword."); Clark v. United States, 289 U.S. 1, 15 (1933) ("The privilege takes flight if the relation is abused."). Accordingly, the government reserves the right to raise any such issues with the Court, should they arise.

## III. Conclusion

For the reasons set forth above, the government respectfully requests that the Court grant the motion and authorize the government's trial team to review the entire file of A. Carone's purported representation of Zhu and Chen, as well as all communications and documents shared among A. Carone, Zhu and Chen.

Respectfully submitted,

MICHAEL G. CONSIDINE
Acting Attorney for the United States Acting under Authority Conferred by 28 U.S.C. § 515

By: /s/
Catherine M. Mirabile
Sara K. Winik
Adam R. Toporovsky
Eric Silverberg
Michael McGuinness
Assistant U.S. Attorneys
(718) 254-7000