UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANTHONY J. CARONE, FRANK V. CARONE, CRYSTAL CHEN, AND YAN PO ZHU,<br><br>Defendants. | : | No. 1:26-cr-00177 (KAM) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FRANK V. CARONE'S MOTION TO SUPPRESS AND FOR A *FRANKS* HEARING**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 3

A. Relevant Allegations About the Charged Scheme .......... 3

B. The iCloud Warrant .......... 4

C. The Phone Warrant .......... 7

LEGAL STANDARD .......... 9

ARGUMENT .......... 10

I. The iCloud Warrant Affidavit Omitted Critical Evidence in the Government's Possession Undermining its Theory of Probable Cause .......... 10

A. The Affidavit Contained Misleading Statements and Omissions About the IP Addresses Purportedly Linking Frank Carone to the Transfer of Funds from Law Firm #2's Account .......... 10

B. Absent the Misleading Statements and Omissions, the Affidavit Does Not Offer Sufficient Probable Cause to Search Frank Carone's iCloud Account .......... 16

II. The Phone Warrant Affidavit Omitted Critical Evidence in the Government's Possession Undermining its Theory of Probable Cause .......... 18

A. The Affidavit Contained Misleading Statements and Omissions About Alleged Text Message Deletions from Frank Carone's iCloud Account .......... 18

1. Messages Cannot Be Deleted on iCloud But Preserved on a Phone .......... 19

2. Frank Carone's iCloud Account Contains No Messages Prior to November 2023 Because of When His Messages Appear to Have First Synced to iCloud .......... 20

3. The Government's Records Demonstrate That Messages Missing from Frank Carone's iCloud Account Are Seemingly Random .......... 21

B. Absent the Misleading Statements and Omissions, the Affidavit Does Not Offer Sufficient Probable Cause to Search Frank Carone's Phone .......... 24

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brown v. D'Amico*,
35 F.3d 97 (2d Cir. 1994)........ 10, 14, 15, 24

*Franks v. Delaware*,
438 U.S. 154 (1978)........ 2, 9

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991)........ 9

*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013)........ 10

*United States v. Lauria*,
70 F.4th 106 (2d Cir. 2023)........ 9, 10

*United States v. Padilla*,
986 F. Supp. 163, (S.D.N.Y. 1997)........ 17, 26

*United States v. Rajaratnam,*
719 F.3d 139 (2d Cir. 2013)........ passim

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996)........ 10, 15, 24

*Washington v. Napolitano*,
29 F.4th 93 (2d Cir. 2022)........ 10, 15

## PRELIMINARY STATEMENT

Because search warrant proceedings are non-adversarial and conducted in secret, the government bears an obligation to present the issuing magistrate judge with a fair and reasonably complete picture of the evidence—including facts that cut against probable cause, not merely facts that support it. As the Second Circuit has instructed, search warrant applicants should include evidence if it is "the kind of thing the judge would wish to know" in determining whether probable cause exists. *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013).

The government failed to carry out its obligation of candor with respect to two search warrants obtained during its investigation of Frank Carone: a December 2024 warrant for the contents of Frank Carone's iCloud account (the "iCloud Warrant"), and a June 2026 warrant for Frank Carone's person and physical devices (the "Phone Warrant"). Both warrants rest on affidavits that paint an exceedingly misleading picture of the facts and omit exculpatory evidence that was in the government's possession at the time. Correcting for the inaccurate and misleading statements, the affidavits would be rendered probable cause-less shells.

The iCloud Warrant affidavit's theory of probable cause leaned most heavily on the assertion that a bank account associated with Anthony Carone's law firm ("Law Firm #2")—which held funds from Andy Zhu and other clients—was actually "controlled at all relevant times by F[rank] Carone," who transferred funds from that account for his own benefit. Those assertions are based upon the attesting agent's misleading representation that three "unique" IP addresses used to access Frank Carone's iCloud account were also used to access Law Firm #2's bank account. In fact, (1) those IP addresses were not unique and were available to numerous people, including Anthony Carone, (2) there was almost no overlap between the IP addresses used to access Frank Carone's iCloud account and those used to access Law Firm #2's bank account during the relevant time periods, and (3) there was significant overlap in the IP addresses used to access

*Anthony* Carone's iCloud account and Law Firm #2's bank account during those same time periods. The affidavit also asserts that one of the three overlapping IP addresses was used to make payment on Frank Carone's American Express bills while omitting that there is zero evidence that Frank Carone's iCloud account was ever accessed through that IP address in 2022 or 2023, the key time period in the Indictment. As reflected herein, all of this information is contained in the very records on which the attesting records relied, and those records crystal clear that Frank Carone did not control the relevant bank account or make the relevant transfers. And because the representation that Frank Carone controlled and accessed that bank account was central to the affidavit's representations of probable cause, both as to the underlying target offenses and the likely existence of evidence on the iCloud, the iCloud warrant should be suppressed pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

The Phone Warrant, obtained years after the government had accessed Frank Carone's iCloud account, likewise contained critical omissions creating a misleading impression that probable cause existed when none did. The Phone Warrant affidavit sought to justify searching Frank Carone's physical phone, as opposed to relying on the iCloud records already in the government's possession, by claiming that text messages were likely deleted from Frank Carone's iCloud account because certain messages recovered from Mr. Zhu's iCloud were missing from Frank Carone's iCloud. But the affidavit failed to explain that Frank Carone's iCloud account contained *no messages whatsoever* from before November 2023, most likely because that was the earliest date his messages were synced to iCloud, or that the missing messages from after that date are seemingly random, undermining any inference that Frank Carone intentionally deleted specific messages that might show culpability. Further, the affidavit asserts that the messages purportedly deleted from Frank Carone's iCloud account could be recovered from Frank Carone's physical

phone, when in fact this is technologically impossible. In other words, the affidavit stated that there was probable cause to believe that Frank Carone's phone would contain evidence that Special Agent Cunder knew or should have known were unlikely to exist on that phone. Once again, the glaring omissions of key exculpatory facts substantially undercuts the purported probable cause to issue the Phone Warrant.

These errors were at a minimum recklessly misleading given that they were based on records Special Agent Cunder purportedly reviewed and marshaled to support probable cause, and on expertise he purportedly had. As such, and given their centrality to the probable cause determinations, the Court should hold a *Franks* hearing and suppress the evidence derived from both warrants.

## BACKGROUND[1]

### A. Relevant Allegations About the Charged Scheme

The Indictment alleges that, between June 2022 and December 2023, Frank Carone accepted bribe payments totaling approximately $120,000 from Yan Po Zhu and Crystal Chen in exchange for using his position as Chief of Staff to the Mayor of New York City to steer an emergency migrant housing shelter to the Microtel, a hotel owned by Mr. Zhu. Ind. ¶ 14. While the Indictment is remarkably thin on allegations showing any sort of purportedly corrupt agreement between Frank Carone and Mr. Zhu, it points to various social gatherings that the two attended, as well as text messages and phone calls exchanged in the charged time period. Ind. ¶¶ 17–28; 45–46.

---

[1] Andrew Tappeto, Associate Managing Director at Nardello & Co. LLC, a global investigations firm, was engaged to review and analyze the materials referenced in the search warrant affidavits and to provide his technical expertise and opinions. Mr. Tappeto's qualifications, analysis, and opinions are set forth in an affidavit accompanying this motion (the "Tappeto Affidavit").

The Indictment further alleges that the bribe payments were directed to a bank account associated with Anthony Carone's law firm, "Law Firm #2," before being disbursed for Frank Carone's benefit. Ind. ¶¶ 34–35. Specifically, funds in Law Firm #2's account were allegedly used to pay Frank Carone's personal American Express bills and transferred to a bank account associated with Frank Carone's law firm. Ind. ¶¶ 39–42. While Frank and Anthony Carone have maintained that Anthony had agreed to lend Frank money during the year Frank served as Chief of Staff, the Indictment characterizes this explanation as part of an attempt to obstruct justice. Ind. ¶ 47.

**B. The iCloud Warrant**

In December 2024—early in the course of the government's two-year investigation into Frank Carone—Magistrate Judge Steven Tiscione issued the iCloud Warrant, directing Apple to disclose the contents of the iCloud account associated with Frank Carone's law firm email address, fcarone@abramslaw.com (referred to in the warrant as the "Target Account," and herein also as "Frank Carone's iCloud Account"), based on an affidavit sworn by Special Agent Anthony Cunder ("iCloud Aff.," attached hereto as **Exhibit 1**). The affidavit purported to set forth probable cause to believe that the Target Account, used by Frank Carone, would contain evidence of various offenses, including violations of Title 18, United States Code, Sections 201, 371, 666, 1001, 1343, 1344, 1346, 1349, 1956, and 1957 (the "Target Offenses"). iCloud Aff. ¶ 4. The agent averred that the affidavit was based on his review of documents and other evidence, and his experience leading and supporting investigations and reviewing electronic evidence maintained by Internet service providers, among other things. iCloud Aff. ¶ 2.

In his affidavit, Special Agent Cunder characterized the state of the investigation—roughly 18 months *before* Frank Carone was charged criminally—and the relevant probable cause to search the iCloud account as follows:

- Subsequent to Frank Carone becoming Mayor Adams' Chief of Staff, several entities began making payments to a bank account for Law Firm #2, a legal entity owned by Anthony Carone. At least one of these entities had been paying a legal entity owned by Frank Carone prior to his role as Chief of Staff. iCloud Aff. ¶¶ 13–14, 16–17, 19, 24–25.
- The payments to Law Firm #2 were made to a Flagstar bank account (the "Flagstar Account") in the name of Law Firm #2. iCloud Aff. ¶ 9. The Flagstar Account, in turn, was used, in part, to pay roughly $400,000 in American Express charges for Frank Carone during the year that Frank Carone was in office. iCloud Aff. ¶ 26.
- The affidavit represented that "several of the unique IP addresses" used to access the Flagstar Account were also used to access Frank Carone's iCloud Account. iCloud Aff. ¶ 30. In support of this conclusion, the agent first stated that he reviewed Apple records that "contained information pertaining to the IP addresses that were used to access [Frank Carone's iCloud Account]," and that "based on [his] review of those records, [ ] seven unique IP addresses (among others) were used to access the [Flagstar Account]," in 2022.[2] iCloud Aff. ¶ 31.
- The affidavit then represented that based upon Special Agent Cunder's review of the Flagstar Account records, which "also contained information pertaining to the IP addresses that were used to access the [Flagstar Account]," three of those same addresses were also used to access Frank Carone's iCloud Account approximately 885 times in total during the same period. iCloud Aff. ¶¶ 32.[3]

---

[2] The affidavit states that "the following seven unique IP addresses (among others) were used to access the [Flagstar Account]," but lists only six IP addresses.

[3] Paragraphs 30 through 32 of the affidavit are inconsistent: at one point, they suggest that there exists seven overlapping IP addresses between Frank Carone's iCloud Account and the Flagstar

- The affidavit further suggested that some of those IP addresses accessed the Flagstar Account on dates that funds from the account were transferred to Frank Carone's American Express account. Specifically, the affidavit represented that on dates when transfers were made from the Flagstar Account to Frank Carone's American Express accounts, the American Express web portal used to make payment was accessed through one of the three IP addresses, among other IP addresses, associated with Frank Carone's iCloud Account. iCloud Aff. ¶ 33.
- As a result, Special Agent Cunder represented that "these facts establish probable cause to believe that, despite being nominally owned by A. Carone, the [Flagstar] Account was controlled at all relevant times by F. Carone, who effectuated the transfers of third-party funds . . . to his own personal benefit through [his American Express accounts]." iCloud Aff. ¶ 34.
- At least two of the entities paying Law Firm #2 received some benefit from the City during the year that Frank Carone was in office. iCloud Aff. ¶¶ 16, 23. One of the entities, the Sapphire Hotel LLC DBA Microtel, received a contract to operate its hotel as an emergency migrant shelter. iCloud Aff. ¶ 23.
- Frank Carone spoke on the phone to Andy Zhu, the owner of the Microtel, 11 times during the year Frank Carone was in office (as well as additional times after Frank Carone left the City's employ). iCloud Aff. ¶ 20.

The iCloud Warrant affidavit did not identify any official acts that Frank Carone took or may have taken with respect to the Microtel, the other entity that received some benefit from the

Account, but at another point they identify only three such IP addresses. As set forth herein and in the Tappeto Affidavit, the amount of such *overlapping* IP addresses appears to be three.

City, or any other entity. Nor did the affidavit identify any benefits whatsoever that any of the other eleven entities which paid the Flagstar Account received from the City while Frank Carone was in office. The affidavit identified no reasons to believe that the iCloud would contain relevant evidence aside from the representation that (i) IP records show Frank Carone controlled the Flagstar Account and appeared to have used Frank Carone's iCloud Account to make payments from the Flagstar Account to his American Express account; and (ii) Frank Carone had occasional phone calls via the phone number associated with the iCloud account for Andy Zhu.

### C. The Phone Warrant

In June 2026—after the government had eighteen months to review the contents of Frank Carone's iCloud following the issuance of the iCloud Warrant—the government applied for the Phone Warrant based on another affidavit sworn by Special Agent Cunder ("Phone Aff.," attached hereto as **Exhibit 2**). Phone Aff. ¶ 1. The warrant was sought and obtained as part of the planned arrest of Frank Carone pursuant to the Indictment. Pursuant to the warrant, agents seized Frank Carone's phone during the process of arresting him.

As in the iCloud Warrant affidavit, Special Agent Cunder averred that the Phone Warrant affidavit was based on his review of documents and other evidence, and his experience leading and supporting investigations and reviewing electronic evidence maintained by Internet service providers, among other things. Phone Aff. ¶ 2. The probable cause to believe that the Target Offenses had been committed roughly mirrored that set forth in the Indictment; notably absent were allegations with respect to 12 of the 13 entities referenced in the iCloud Warrant affidavit that had paid Law Firm #2 via the Flagstar Account. In other words, by this point in the investigation, the Government appeared to have failed to identify any corrupt arrangement between any of those entities and Frank or Anthony Carone.

To justify a need to search Frank Carone's physical phone, as opposed to relying on records of Frank Carone's iCloud Account already in the government's possession, the affidavit asserted that text messages relevant to the charged scheme were likely intentionally deleted from Frank Carone's iCloud Account, and suggested that those allegedly deleted messages could be recovered from Frank Carone's physical phone. Phone Aff. ¶¶ 26–27. In support of this claim, the Phone Warrant affidavit pointed to text messages that were recovered from Mr. Zhu's iCloud account but missing from Frank Carone's iCloud Account: "Zhu's iCloud included a number of relevant text messages between Zhu and F. Carone, some of which are contained in the Indictment"—but notably, the only examples provided in the Phone Warrant affidavit are three messages from a single day in the final month of the alleged 18-month conspiracy. Phone Aff. ¶ 26 (citing Ind. ¶¶ 45–46).

The affidavit went on to state: "Even though F. Carone's iCloud account contained relevant text messages and other content during the same period, including messages between F. Carone and Zhu immediately before and after the incriminating text messages, none of the incriminating text messages between F. Carone and Zhu were located on F. Carone's iCloud." *Id.* The affidavit then stated that, from Special Agent Cunder's training and experience, "there are times when relevant messages can be recovered from one's physical device even though they are not available on an iCloud account." Phone Aff. ¶ 27. In other words, Special Agent Cunder cited the likely deletion of incriminating messages on Frank Carone's iCloud Account to support the notion that they may exist on his physical phone.

To support the inference that the absence of certain messages on Frank Carone's iCloud Account reflected intentional deletions relevant to the charged scheme, the affidavit further cited to "obstructive acts" allegedly taken by Frank Carone. Phone Aff. ¶ 27. That assertion was based

exclusively on allegations relating to a promissory note that Frank and Anthony Carone purportedly fabricated to create the impression that payments from Law Firm #2 to Frank Carone's American Express account were personal loans to Frank Carone. Phone Aff. ¶¶ 18–24.

Based on the representations in Special Agent Cunder's affidavit, Magistrate Judge Ona T. Wang authorized the Phone Warrant to search the persons of Frank Carone and Anthony Carone, and any electronic devices in their possession, including Frank Carone's phone.

## **LEGAL STANDARD**

Under *Franks v. Delaware*, defendants are entitled to a hearing to test the validity of a search warrant affidavit upon a "substantial preliminary showing" that (i) the warrant affidavit contained a false statement or material omission made intentionally or with reckless disregard for the truth, and (ii) the false statement or omission was necessary to the issuing judge's finding of probable cause. 438 U.S. 154, 155–56 (1978); *see also United States v. Lauria*, 70 F.4th 106, 131–32 (2d Cir. 2023) (vacating judgment and remanding for a *Franks* hearing on unresolved factual issues). If, at the hearing, defendants establish the necessary elements by a preponderance of the evidence, then "the search warrant must be voided and the fruits of the search excluded." *Franks*, 438 U.S. at 156.

*Franks* protects against both affirmative false statements and misleading omissions. *See Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). "Though an officer need not volunteer every fact that arguably cuts against the existence of probable cause, the officer may not omit circumstances that are critical to the evaluation of probable cause." *Brown v. D'Amico*, 35 F.3d 97, 99 (2d Cir. 1994). The warrant affiant "cannot make unilateral decisions about the materiality of information" or "merely inform the magistrate or judge of inculpatory evidence." *Washington v. Napolitano*, 29 F.4th 93, 108 (2d Cir. 2022).

In order to prove that a misstatement or omission in a warrant application was intentionally or recklessly misleading, a defendant need not provide direct evidence of the affiant's subjective intent; it is sufficient to show that the affiant possessed, or had ready access to, the exculpatory information the affidavit omitted. *See Rajaratnam*, 719 F.3d at 154. An affidavit that presents only inculpatory evidence while withholding known, contrary information is "calculated to mislead." *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). Further, recklessness may be inferred where the omitted information was "clearly critical" to the probable cause determination. *Rajaratnam*, 719 F.3d at 154; *see also United States v. Lahey*, 967 F. Supp. 2d 698, 723–27 (S.D.N.Y. 2013) (suppressing evidence after finding reckless omissions).

To assess materiality, courts in this Circuit apply a corrected-affidavit methodology: the court sets aside the challenged material, adds back any wrongfully omitted information, and asks whether the affidavit as corrected still establishes probable cause. *Lauria*, 70 F.4th at 118–19. If the corrected affidavit does not establish probable cause, the omission or misstatement is material. *Id.* at 118.

## ARGUMENT

### I. The iCloud Warrant Affidavit Omitted Critical Evidence in the Government's Possession Undermining its Theory of Probable Cause

#### A. The Affidavit Contained Misleading Statements and Omissions About the IP Addresses Purportedly Linking Frank Carone to the Transfer of Funds from Law Firm #2's Account

As described above, in establishing probable cause for the commission of the Target Offenses and for the existence of evidence on Frank Carone's iCloud Account, Special Agent Cunder relied heavily on the theory that Frank Carone controlled the Flagstar Account (*i.e.*, Law Firm #2's bank account) and personally transferred funds from that account (including funds he knew to be paid by Andy Zhu) to pay his American Express bills, including via the phone affiliated

with the iCloud Account. This allegation was premised principally on the affidavit's assertion that "several of the unique IP addresses used to access [the Flagstar Account] were also used to access [Frank Carone's iCloud Account]." iCloud Aff. ¶ 30. Indeed, the vast majority of the paragraphs in the affidavit setting out probable cause relate to the funds paid to the Flagstar Account, the use of those funds to pay Frank Carone's American Express account, and the IP address analysis purportedly demonstrating that Frank Carone himself engineered that flow of funds via his control over the Flagstar Account.

That analysis is demonstrably false, and Special Agent Cunder either knew or should have known as much, because the very records he relied upon lay that falsity bare. As an initial matter, the affidavit is misleading in suggesting that a single IP address corresponds to a single user—here, supposedly Frank Carone—whereas one IP address is often shared among multiple users who access the internet through a shared internet connection, or from a common location.[4] It is thus unsurprising that—as the affidavit also importantly omits—the same IP addresses Special Agent Cunder identified as accessing the Flagstar Account and Frank Carone's iCloud Account ***were also used by devices belonging to numerous other individuals, including Anthony Carone.*** Finally, and most fundamentally, any responsible review of the IP address records available to Special Agent Cunder would have made clear that the Flagstar Account ***was not*** "controlled at all relevant times by F. Carone, who effectuated the transfers of third-party funds," as he represented to the magistrate judge. These falsehoods should have been evident for several reasons:

---

[4] As explained in the Tappeto Affidavit, an IP address is an identifier for an internet connection, and it can be used to identify the network connection from which activity originated at a particular time. Multiple users, devices, or accounts may use the same IP address through a shared wireless network or internet connection. Tappeto Aff. ¶ 6. In practice, a single IP address is often used by multiple people because a device connected to the internet through a shared network, whether a home, an office, or a family member's device, will register the same IP address regardless of who is using the device. *Id.*

- The iCloud Warrant affidavit states that three particular IP addresses (38.140.163.118, 67.247.104.223, and 50.74.255.170) were used to access both the Flagstar Account and Frank Carone's iCloud Account, relying on this coincidence to assert that Frank Carone controlled the Flagstar Account. iCloud Aff. ¶ 32.
- As reflected in the attached Tappeto Affidavit, the relevant Flagstar Account records, produced in discovery, *only* contain IP address data beginning in November of 2022, whereas Special Agent Cunder's affidavit referenced an investigation into payments to Anthony Carone via the Flagstar Account beginning in January of 2022, when Frank Carone began working for Mayor Adams. Tappeto Aff. ¶ 15; iCloud Aff. ¶¶ 14, 16–17. Special Agent Cunder failed to acknowledge that his IP address analysis was based on records that *did not include* a significant portion of the alleged conspiracy under investigation.
- As noted above, Special Agent Cunder identified three IP addresses that overlapped between Frank Carone's iCloud Account and the Flagstar Account. But those addresses contained *almost no temporal overlap* during the relevant time periods—and far less than the overlap between *Anthony* Carone's iCloud account and the Flagstar Account. Tappeto Aff. ¶ 19.
- Specifically, as reflected in the Tappeto Affidavit, it appears that those three IP addresses connected to the Flagstar Account 75 times in November and December of 2022, and 71 of those instances came from IP addresses that publicly available information and subscriber records link to an Abrams Fensterman office (the "Abrams Fensterman IP Addresses"). *Id.* ¶ 17. As Special Agent Cunder surely knew, Frank Carone worked at Abrams Fensterman prior to 2022 but not during 2022, whereas Anthony Carone worked

at Abrams Fensterman from 2022 forward.[5] The alleged conspiracy did not exist prior to 2022.

- Consistent with their employment history, the Apple Records show that Anthony Carone's iCloud connected to the Abrams Fensterman IP Addresses overwhelmingly more frequently (325 times) than Frank Carone (11 times) in November-December 2022; no available IP data from Flagstar exists prior to that point. *Id.* Thus, it is far more likely (indeed, 30 times more likely) that Anthony Carone, and not Frank Carone, controlled the Flagstar Account and accessed that account while at Abrams Fensterman in 2022, the heartland of the supposed conspiracy. That Anthony Carone controlled and accessed the Flagstar Account is logical and innocuous, given that the account is held in his own law firm's name.
- From 2023 forward, the Flagstar Account was accessed hundreds of times via the Abrams Fensterman IP Addresses. Again, Anthony Carone's iCloud connected to those IP addresses far more frequently (457 times) than Frank Carone's iCloud (83 times). *Id.* ¶ 18. Given that Frank Carone resumed his affiliation with Abrams Fensterman in 2023, it is not surprising that he connected to those IP addresses at that point, albeit with substantial less frequency than Anthony Carone.[6] Once again, it is far more likely that Anthony Carone, and not Frank Carone, accessed the Flagstar Account while at Abrams Fensterman in 2022.
- While Special Agent Cunder relies on American Express records showing that IP address 38.140.163.118 was used to access the American Express payment portal on the date of

[5] For the avoidance of doubt, Abrams Fensterman is not Law Firm #2. Anthony Carone was affiliated with both firms at the relevant times.

[6] The relevant Apple data also shows that Jennifer Nicoletta, another individual affiliated with both Frank and Anthony Carone made use of the relevant IP addresses. Tappeto Aff. n.3.

each transfer date, there available records show that Frank Carone's iCloud Account *never once* accessed that IP address in 2022 or 2023. *Id.* ¶ 18. Moreover, because the Flagstar Account has no logged IP activity of any kind before November 9, 2022, there is no Flagstar-side data for any dates of transfer predating November 9, 2022 against which the American Express data could even be compared. Tappeto Aff. ¶ 20.

This context and additional data, available to the agent and omitted from his affidavit, is remarkable. It makes clear that the central tenet of the government's analysis—that Frank Carone was controlling the relevant bank account and flow of funds—was unsupportable and false. And it further shows that Anthony Carone is far more likely to have controlled the Flagstar Account, consistent with the fact that his law firm owned that account. That is not a technical distinction: Special Agent Cunder went to great lengths to connect Frank Carone to the Flagstar Account because, in the absence of that connection (or other evidence, which was not presented), there would be no reason to believe that Frank Carone knew who was paying Anthony Carone (including Andy Zhu) or when such payments were arriving.[7] As discussed below, it also makes it far less likely that relevant evidence of the money transfers would exist on Frank Carone's iCloud Account. All told, the missing information is exactly the sort of exculpatory context that a magistrate judge "would wish to know," in assessing probable cause—and therefore is information that should not have been omitted from the iCloud Warrant affidavit. *Rajaratnam*, 719 F.3d at

[7] Importantly, as the iCloud Warrant affidavit makes clear, Anthony Carone, via Law Firm #2, had been paying Frank Carone's American Express bills throughout 2022 – many months before the alleged conspiracy began and Zhu began paying Law Firm #2. If Frank Carone had not been accessing the Flagstar Account throughout 2022 – as the available data suggests he had not – he would not have known the extent and cadence of these payments, let alone when Zhu began also making payments to Law Firm #2.

154; *see also Brown*, 35 F.3d at 99 (affiant may not omit circumstances critical to the probable cause evaluation).

This is also information that Special Agent Cunder would be expected to know. He devoted multiple paragraphs of his affidavit to detailing his extensive knowledge and understanding of Apple data, including how that data intersects with IP addresses. *See* iCloud Aff. ¶¶ 41–55. In doing so, Special Agent Cunder explained that "IP address and device identifier information can help to identify *which computers or other devices* were used to access the account"—not which individuals—indicating that he has an understanding of how IP addresses function. iCloud Aff. ¶ 51. But despite being familiar with Apple records and IP address analysis, Special Agent Cunder ignored the fact that the very records cited in in his affidavit show that Anthony Carone, and not Frank Carone, almost surely controlled the Flagstar Account. At a minimum, the agent was reckless in failing to do anything other than a cursory review of the data he marshalled to support his case for probable cause.

In any event, Special Agent Cunder was not permitted to "make unilateral decisions about the materiality of information," *Napolitano*, 29 F.4th at 108, and/or present only inculpatory information while omitting exculpatory context to which he had access, *Rajaratnam*, 719 F.3d at 154. But by presenting an IP address analysis designed to link Frank Carone to the allegedly inculpatory financial transactions while in possession of underlying data expressly contradicting that link, that is exactly what he did. Because this was "clearly critical" information within the affiant's possession, *Rajaratnam*, 719 F.3d at 154, omitting this information from the affidavit was at least recklessly "calculated to mislead." *Reilly*, 76 F.3d at 1280; *see also Brown*, 35 F.3d at 99 (affiant may not omit circumstances critical to the probable cause evaluation).

**B. Absent the Misleading Statements and Omissions, the Affidavit Does Not Offer Sufficient Probable Cause to Search Frank Carone's iCloud Account**

Correcting the affidavit to reflect that the cited IP addresses are shared amongst numerous individuals, and that the IP data indicates that it is far more likely that Anthony Carone controlled his own law firm's bank account, severely undercuts the government's probable cause argument, both as to the underlying offense and as to the potential existence of evidence on Frank Carone's iCloud Account. *See Rajaratnam*, 719 F.3d at 146 (corrected affidavit must be assessed for whether the "untainted portions" support probable cause). The overlap in IP addresses used to access the Flagstar Account and Frank Carone's iCloud Account is the affidavit's *only* basis for asserting probable cause that Frank Carone, rather than his brother, controlled Law Firm #2's bank account and transferred funds from that account for his own benefit. That clearly erroneous assertion, in turn, does the affidavit's heaviest lifting in establishing probable cause that evidence of the charged scheme would be found on Frank Carone's iCloud Account. Without probable cause to believe that Frank Carone controlled the Flagstar Account and personally transferred funds from it, what remains are allegations that (i) Anthony Carone helped pay his brother's American Express account out of the same account that Mr. Zhu *and many other* clients paid Anthony Carone; and that (ii) Frank Carone and Mr. Zhu exchanged 11 phone calls in 2022 (and additional calls in 2023 and 2024 after Frank Carone left office), the year in which Zhu's hotel received a City contract, but without identifying any relevant action from Frank Carone. Without more, that evidence does not establish probable cause that evidence of the scheme would be found on Frank Carone's iCloud Account, for at least two reasons.

***First***, in the absence of information suggesting that Frank Carone was behind the relevant transfers or controlled the Flagstar Account, the affidavit sets forth no facts indicating that Frank Carone had *any knowledge* that Andy Zhu (or any other person or entity) was making payments to

Anthony Carone and/or the Flagstar Account, or when such payments were being made. Without any evidence of such knowledge, as well as any evidence of actions that Frank Carone may have taken with respect to the emergency migrant housing contract at issue, the simple fact that Frank Carone had phone calls with Andy Zhu in 2022 is indicative of nothing—and certainly not probable cause to believe that a crime was committed.

***Second***, in the absence of information linking the payments at issue to Frank Carone's iCloud Account, the exclusive probable cause set forth with respect to that account is the fact that Frank Carone and Andy Zhu spoke on the phone using the number associated with that account—details of which the Government was already aware via toll records. There was no probable cause set forth as to whether Frank Carone and Andy Zhu texted via Frank Carone's iCloud Account, let alone whether they texted about the emergency migrant housing contract at issue. Instead, the affidavit simply speculated that, "based on [Special Agent Cunder's] training and experience, [Frank Carone's iCloud Account] includes backups of text messages, emails, and calendar invitations which ***may*** *reflect specific communications and meetings that F. Carone had with individuals involved in the alleged pay-to-play scheme described above*," and "***may also*** *contain bank statements and communications regarding*" Frank Carone's American Express account and the use of the Flagstar Account to make payments on it. iCloud Aff. ¶ 37. That type of generic speculation—unsupported by factual allegations—would have been woefully insufficient to establish probable cause to obtain and review Frank Carone's entire iCloud account for evidence of criminality.

For these reasons, Frank Carone is entitled to a *Franks* hearing on whether there was probable cause to issue the iCloud Warrant. *See United States v. Padilla*, 986 F. Supp. 163, 168–69 (S.D.N.Y. 1997) (*Franks* hearing required where there was "a strong likelihood that this

complaint failed to establish probable cause in the absence of the false material"). A hearing would allow the Court to undertake a more fulsome review of the relevant data. It would also allow Special Agent Cunder to testify on the issue of how and why he may have misconstrued or disregarded the information in the government's possession, and thus would aid the Court in determining whether the evidence obtained from the iCloud Warrant should be suppressed.

## II. The Phone Warrant Affidavit Omitted Critical Evidence in the Government's Possession Undermining its Theory of Probable Cause

### A. The Affidavit Contained Misleading Statements and Omissions About Alleged Text Message Deletions from Frank Carone's iCloud Account

The only basis offered in the Phone Warrant affidavit for searching Frank Carone's physical phone—as opposed to relying on the iCloud records that the government had already obtained—is that messages were "likely deleted" from Frank Carone's iCloud Account, and that "there are times when relevant messages can be recovered from one's physical device even though they are not available on an iCloud account." Phone Aff. ¶¶ 26–27. As noted above, the Phone Warrant affidavit identifies text messages that were recovered from Mr. Zhu's iCloud account but missing from Frank Carone's iCloud Account and bootstraps onto that assertion additional allegations about obstructive behavior with respect to the promissory note. As a result, Special Agent Cunder represented that there existed probable cause to believe that a search of Frank Carone's physical phone would recover relevant text messages that had been deleted as a further act of obstruction. Phone Aff. ¶ 27. The affidavit offered no other reason why a search of Frank Carone's phone might yield evidence beyond what the iCloud Warrant already produced.

As set forth below, the affidavit omitted key information undermining any suggestion that Frank Carone's physical phone might have messages that are not contained on his iCloud account. In particular, it does not disclose that (1) it is technologically impossible for messages to be deleted directly from an iCloud account but remain on the physical device; (2) Frank Carone's iCloud

Account had ***no messages at all*** prior to November 2023 (*i.e.*, the vast majority of the alleged conspiracy), most likely because that was when his "Messages in iCloud" feature was first enabled; and (3) messages from after November 2023 missing from Frank Carone's iCloud Account follow no consistent pattern, but appear random.

#### 1. Messages Cannot Be Deleted on iCloud But Preserved on a Phone

First, the affidavit's theory that any messages deleted from Frank Carone's iCloud might nonetheless be recovered from the physical device is not merely unsupported, it is technologically impossible. The affidavit states, "there are times when relevant messages can be recovered from one's physical device even though they are not available on an iCloud account." Phone Aff. ¶ 27. But the affidavit does not explain how a message deleted on an iCloud account could be retrieved from the physical device. Nor could it, because deletion from an iCloud account followed by recovery from the physical device is impossible in all but one irrelevant context. Tappeto Aff. ¶ 33–34. As detailed in Mr. Tappeto's affidavit, there is no way to delete messages in iCloud because there is no way to even access messages directly in iCloud. Tappeto Aff. ¶ 33. Rather, a user may only delete a message by accessing it on his or her physical device (*e.g.*, a phone), which then causes the message to be removed from iCloud and any other synchronized devices. Tappeto Aff. ¶ 35.[8]

To be sure, it is possible to delete messages on a physical device, such as a phone, without deleting those messages on the iCloud: if the message exists in an iCloud backup, then that

[8] The one exception arises when a message is deleted from one physical device while another device synced to the same iCloud account is offline: the deletion occurs on, and syncs from, the first device, removing the message from iCloud, but because the second device is not connected to the internet, it does not sync with iCloud and the message may still exist on that device. Tappeto Aff. ¶ 35. But the Phone Warrant affidavit does not suggest that this rare situation might have happened here with Frank Carone's phone.

message may remain in iCloud even after it is deleted from a device. Tappeto Aff. ¶ 36. But the reverse—deleting messages on iCloud while keeping those messages on a physical device—is impossible, except in the narrow context described *supra* footnote 5.[9] In addition, where a phone is not backed up to the iCloud, messages may exist on the phone but not on the cloud. But the implication made by Special Agent Cunder—that messages purportedly deleted by Frank Carone from his iCloud could be located on his phone—is misleading.

**2. Frank Carone's iCloud Account Contains No Messages Prior to November 2023 Because of When His Messages Appear to Have First Synced to iCloud**

Further, the affidavit omits a critical threshold fact that Special Agent Cunder knew or should have been aware of at the time he submitted it: Frank Carone's messages do not appear to have been synced or to his iCloud account prior to November 2023, 11 months *after* he left City employ. Thus, messages from before November 2023 could not have been deleted; they were never captured on Frank Carone's iCloud Account in the first place, and/or no available backup with such text messages existed at Apple at the time it produced the records to the government.

This information is evident from the iCloud search warrant returns that the government had in its possession at the time it applied for the Phone Warrant, which reflect the date that Frank Carone appears to have first enabled synching his messages to iCloud. In particular, Frank Carone's iCloud message collection (produced by the government as EDNY_0000051157) shows that, with the exception of a single, unidentifiable placeholder message sent on July 22, 2022, the earliest message in the iCloud account is from November 13, 2023. Tappeto Aff. ¶ 24. The

[9] Even assuming that deleting messages from an iCloud account were technically possible, for the affidavit's theory to make sense, Frank Carone would have had to access his iCloud account and selectively delete messages from the iCloud but keep those same messages on his physical phone. This is farfetched and illogical, and the government's reliance on this theory to seek the Phone Warrant only further demonstrates that the government lacked any credible basis for probable cause.

absence of any real message data predating November 13, 2023 strongly indicates that Frank Carone did not enable message syncing prior to that date. Tappeto Aff. ¶ 25. It follows that the wholesale absence of any message data predating November 13, 2023 is patently inconsistent with manual, selective deletions of messages prior to that date. Tappeto Aff. ¶ 26.

In the affidavit, Special Agent Cunder wrote that Mr. Zhu's iCloud account contained relevant messages with Frank Carone, citing as examples a few messages from November and December 2023, and that "[e]ven though F. CARONE's iCloud account contained relevant text messages and other content during the same period, including messages between F. CARONE and Zhu immediately before and after the incriminating text messages, none of the incriminating text messages between F. CARONE and Zhu were located on F. CARONE's iCloud." Phone Aff. ¶¶ 26–27. It is true that certain messages with Zhu from *after* November 2023 were not on Frank Carone's iCloud, although, as described below, the pattern is strongly suggestive of randomness and not intentional deletion of incriminating messages. In any event, however, by omitting the fact that Frank Carone's iCloud contained *no messages whatsoever* (whether with Mr. Zhu or anyone else) during roughly the first 17 months of the 18-month alleged conspiracy, and throughout the entire time that Frank Carone was in City Hall, Special Agent Cunder painted a disturbingly misleading picture of what the information available to him showed. Put simply, there would have been no reason not to acknowledge as much other than to exaggerate the significance of the supposed deletions.

### 3. The Government's Records Demonstrate That Messages Missing from Frank Carone's iCloud Account Are Seemingly Random

Finally, for the time period after November 2023, the affidavit misleadingly represented that messages on Mr. Zhu's iCloud account that are missing on Frank Carone's iCloud Account indicate that Frank Carone purposefully deleted certain messages which might show culpability.

The full record of these messages demonstrates that there is no consistent pattern or design as to which messages are missing from Frank Carone's iCloud, strongly suggesting that Frank Carone did not engage in a targeted deletion of messages from his iCloud account.

It is true that a single series of allegedly "incriminating" messages cited in the Indictment are missing from Frank Carone's iCloud Account, namely, three December 25, 2023 texts in which Frank Carone says he is "not happy about something," and is "not discussing anything until past is worked out," and Mr. Zhu responds, "I asked my partners to pay you for a year." Tappeto Aff. ¶ 30; *see also* Ind. ¶ 46. However, the only other allegedly incriminating message from after November 2023 cited in the Indictment—the November 21, 2023 message from Frank Carone saying "I need to see you," Ind. ¶ 45—is ***not*** missing from Frank Carone's iCloud. Tappeto Aff. ¶ 31. Thus, Special Agent Cunder falsely stated that "none of the incriminating text messages" between Frank Carone and Mr. Zhu were located on Frank's iCloud. Moreover, *all messages* from December 25, 2023—including a "Merry Christmas" text from Mr. Zhu—are missing from Frank Carone's iCloud, showing that he did not target only the allegedly incriminating messages for deletion. Tappeto Aff. ¶ 30.

Further, the remaining messages missing from Frank Carone's iCloud in the same post-November 2023 time period are non-substantive well-wishes, or messages coordinating logistics or discussing unrelated matters that appear to be arbitrarily missing—each of them in the context of entire days' worth of innocuous messages. For example, the following messages between Frank Carone and Zhu from the same time period are missing from Frank Carone's iCloud:

- A January 3, 2024 message from Frank Carone saying "Happy new year my friend";
- A January 5, 2024 message from Mr. Zhu saying "please text me your daughter's engagement party invite";

- A January 18, 2024 message from Mr. Zhu saying "Please call me when you free." While this January 18 message is missing from Frank Carone's iCloud, a January 24, 2024 message from Mr. Zhu saying substantially the same thing ("Hi brother. Call me when you free please") is *not* missing.
- Messages sent from February 23 to 27, 2024 coordinating a meeting in the city. While those messages are missing from Frank Carone's iCloud, a January 4, 2024 message from Mr. Zhu coordinating a meeting with Frank Carone ("Hi brother Where are we meet later.") is *not* missing.
- A March 5, 2024 message from Mr. Zhu saying "How much is the asking price." While this March 5 message is missing from Frank Carone's iCloud, a March 8, 2024 message from Mr. Zhu asking the same question ("Is this for sale? If yes, what's the asking price") is *not* missing.

Tappeto Aff. ¶ 32.

Thus, the messages missing from Frank Carone's iCloud do not fit a consistent pattern, and far from suggesting nefarious targeted deletions, they reflect innocuous deletions made at random. This pattern of seemingly random deletions adds important exculpatory context to Special Agent Cunder's representation that "incriminating text messages…were likely deleted by F. CARONE from F. CARONE's iCloud account." Phone Aff. ¶ 26.

***

The exculpatory information described above was critical to the probable cause evaluation and thus should not have been omitted from the Phone Warrant affidavit. *Rajaratnam*, 719 F.3d at 154. Further, the agent knew, or should have known, this information from the records that he purportedly reviewed that formed the basis for the Phone Warrant application. And as someone

with extensive experience "reviewing electronic evidence maintained by Internet service providers, such as Apple," Phone Aff. ¶ 1, he should have known that messages could not be deleted from an iCloud but remain on a cellphone. Because this was "clearly critical" information within the affiant's possession, *Rajaratnam*, 719 F.3d at 154, omitting this information from the affidavit was intentionally or recklessly "calculated to mislead." *Reilly*, 76 F.3d at 1280; *see also Brown*, 35 F.3d at 99 (affiant may not omit circumstances critical to the probable cause evaluation).

### B. Absent the Misleading Statements and Omissions, the Affidavit Does Not Offer Sufficient Probable Cause to Search Frank Carone's Phone

The affidavit's probable cause theory falls apart upon considering the omitted facts detailed above. ***First***, and most fundamentally, the fact that it is impossible to delete messages directly from an iCloud account—let alone to recover those messages from the associated physical device—eliminates the entire basis of the probable cause for searching Frank Carone's phone. Put differently, if Special Agent Cunder had disclosed the technological impossibility of recovering so-called deleted iCloud messages from Frank Carone's physical devices, there would be no reason to believe that Frank Carone's phone contained *anything* relevant beyond what was already in the government's possession.

***Second***, if the affidavit had disclosed that there were no messages at all pre-dating November 2023 on Frank Carone's iCloud, then the only missing messages that could possibly support the affidavit's theory of deletion are three messages from a single day in the final month of the charged conspiracy. *See* Phone Aff. ¶ 26 (citing Ind. ¶¶ 45–46); Tappeto Aff. ¶ 28. But nearly every single message between Frank Carone and Mr. Zhu cited in the Indictment was exchanged ***before*** November 2023. Ind. ¶¶ 18, 23, 26. It is exceedingly unlikely that the absence of just those few messages in the final month of an alleged 18-month conspiracy would have been

sufficient to establish probable cause to search Frank Carone's phone, particularly in light of the additional misrepresentations and omissions outlined herein.

***Third***, that is especially so in light of the larger context of messages missing from the iCloud. The affidavit suggested a nefariousness that does not hold up under a more careful review of the allegedly deleted messages. The affidavit falsely stated that "none of the incriminating messages" between Frank Carone and Mr. Zhu were on Frank Carone's iCloud Account, when in fact the November 21, 2023 message cited in Paragraph 45 of the Indictment ***is*** on Frank Carone's iCloud, undercutting the affidavit's suggestion that Frank Carone intentionally deleted messages relating to the charged scheme. Additionally, if the affidavit had made clear that there was no unifying pattern to the messages missing from Frank Carone's iCloud Account—or that most of the missing messages were both entirely innocuous and irrelevant to the charged scheme—Magistrate Judge Wang would have had a vastly different understanding of whether any messages were intentionally deleted in an attempt to hide culpability, as opposed to at random.

This exculpatory information omitted from the Phone Warrant affidavit undermines any inference that Frank Carone was deleting messages from his iCloud account, or that Frank Carone's physical phone might contain messages missing from his iCloud account. Absent that inference, the affidavit contains no real basis for asserting probable cause that Frank Carone's phone contains evidence of the charged scheme that the government would not already possess from the iCloud Warrant. Accordingly, Frank Carone is entitled to a hearing on whether there was probable cause to issue the Phone Warrant. *See Padilla*, 986 F. Supp. at 168–69. As with the iCloud Warrant, a hearing would allow the Court to consider Special Agent Cunder's testimony on why he omitted the key information outlined above and to more fully assess the relevant data in order to determine whether the evidence obtained from the Phone Warrant should be suppressed.

## CONCLUSION

For the foregoing reasons, Frank Carone is entitled to a *Franks* hearing as to both the iCloud Warrant and the Phone Warrant.

Dated: New York, New York
October 2, 2026

Respectfully submitted,

**COOLEY LLP**

By: *__/s/ Andrew D. Goldstein__*
Andrew D. Goldstein

Russell Capone
Rona S. Proper
55 Hudson Yards
New York, New York 10036
Phone: (212) 479-6000
Email: agoldstein@cooley.com
rcapone@cooley.com
rproper@cooley.com

**AGNIFILO INTRATER LLP**

Marc A. Agnifilo
Jacob Kaplan
Karen Friedman Agnifilo
Zach Intrater
140 Broadway, Suite 4530
New York, New York 10036
Phone: (646) 205-4350
Email: marc@agilawgroup.com
jacob@agilawgroup.com
karen@agilawgroup.com
zach@agilawgroup.com

**AIDALA, BERTUNA & KAMINS, P.C.**

Arthur L. Aidala
546 Fifth Avenue
New York, New York 10036
Phone: (212) 486-0011
Email: aidalaesq@aidalalaw.com

*Attorneys for Defendant Frank V. Carone*